# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ROLAND DIGITAL MEDIA, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.: 2:17-cv-00069** |
| | ) | **Chief Judge Crenshaw** |
| **CITY OF LIVINGSTON,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

In this action that was removed from the Chancery Court for Overton County, Tennessee, Roland Digital Media, Inc. ("Roland") challenges the denial of its applications to erect billboards in the City of Livingston, Tennessee ("the City"). Pending before the Court are Cross-Motions for Summary Judgment (Doc. Nos. 22, 23) that have been fully briefed by the parties (Doc. Nos. 22-1, 25, 27, 29). For the reasons that follow, Roland's Motion will be denied, while the City's Motion will be granted to the extent it argues Roland's claims fail as a matter of law.

## I. Factual Background

Only a few facts are provided by the parties in the initial submissions, and that is all that is necessary to place the arguments in context. Those fact are as follows:

Roland is a small business operating in the Upper Cumberland region of Tennessee. It is primarily engaged in the creation, maintenance, and marketing of outdoor signage.

At some point in 2016, Roland entered into a lease with Ruth Hill for the purpose of erecting a billboard on her property located at 106 West Seventh Street in Livingston, and thereafter applied for a permit to erect the billboard. The applications indicated that it was for an "off-premise sign" that would be "single faced" and 11' x 24'. (Doc. No. 22-2 at 5). A handwritten notation at the

bottom of the application stated: "The application is denied or rejected due to the fact that the size [is] more than 9 square feet for an off premises sign." (Id.). On December 12, 2016, the City's Department of Codes Administration issued a "Stop Work Order" that stated "the Livingston Municipal Zoning Ordinance does not allow billboard or other off premise signs of greater than 9 square feet. 11-203.9.1(n)." (Doc. No. 22-2 at 6).

Shortly before filing suit in state court, Roland filed three other applications indicating that it intended to erect billboards within city limits on property owned by (1) Freeman Lee Crowder III located at 919 West First Street, and also 5490 Bradford Hicks Drive; and (2) David Garret located at 901 Lee Drive. For each of these three properties, Roland intended to erect a "double faced" billboard measuring 10'6" x 24'. (Doc. No. 22-2 at 7-9). Those permits were not approved and apparently remain pending while this case runs its course.

Under the zoning ordinance, off-premises signs are defined as "a sign which directs attention to a business or service to be or being conducted, sold, rented, or otherwise offered for disposition elsewhere than on the premises." Ordinance ¶ 11-202.43. As for the size of off-premises signs, the Ordinance provides:

> Off-premises signs for commercial and industrial business are permitted. One (1) off-premises shall be permitted and said sign shall be located on private property with the property owner's consent in writing with a limit of one (1) off-premise sign per tax parcel. Signs are not to exceed the size of nine (9) square feet. Signs may be installed on city right of way and ten (10) feet from corner of a street intersection. All signs must be registered at Livingston City Hall with the Codes Inspector, at no cost or have a date on the sign in plain view when set out.

Id. § 11-203.9.1(n).[1] Elsewhere, the Ordinance provides for signs permitted in all commercial and

---

[1] During the pendency of the Roland's permit applications, this section of the ordinance was changed to remove a restriction that off-premises signs had to relate to a business or entity within the City's corporate limits. (Doc. No. 23-3 at 1). Ultimately, this change has no bearing on the resolution of the issues in this case.

industrial districts as follows:

**11-203.9.3 Signs Permitted in all C and I Districts**

(a) The size of wall sign(s) cannot exceed 15% of total size of front wall, based on height and width of whole wall, on which the sign is located, with no maximum size wall sign.

(b) If several businesses are located in a "strip center", the wall sign for each business cannot exceed 15% of the portion of the wall which forms the front of that business.

(c) If a business wants to put a wall sign on both front and side walls, the combined total of signs cannot exceed 20% of the size of front wall.

(d) The maximum size for ground sign(s) is 120 sq.ft.

Id. § 11-203.9.3.

Each of Roland's permit applications was for an off-premise sign, and each sought to erect a sign that was in excess of 250 square feet – many multiples of the size permitted for off-premise signs, and more than twice the size of all other ground signs permitted under the Ordinance. Indeed, at a hearing before the Board of Zoning Appeals on June 26, 2017, Roland's President, David Roland, stated that his proposed signs were "you know, it's basically as close as Overton County will ever have to a TV screen right there on that corner" and it is "basically . . . a giant TV screen." (Doc. No. 23-4, at 3; 23-5 at 1).

## II.  Standard of Review

The standards governing summary judgment have been restated on countless occasions and are well known. It suffices to note: (1) summary judgment is only appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a); (2) the facts and inferences must be construed in favor of the nonmoving party, Van Gorder v. Grand Trunk W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007); (3) the Court does not

weigh the evidence, or judge the credibility of witnesses when ruling on the motion, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); and (4) the mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment, <u>Rodgers v. Banks</u>, 344 F.3d 587, 595 (6th Cir. 2003). Furthermore, "[t]he standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." <u>Ferro Corp. v. Cookson Grp., PLC</u>, 585 F.3d 946, 949 (6th Cir. 2009).

### III.  <u>Application of Law</u>

Roland seeks summary judgment on the grounds that the Ordinance (1) impermissibly favors commercial speech over non-commercial speech; (2) contains impermissible content-based restrictions on speech; and (3) violates the First Amendment to the United States Constitution by totalling banning Roland's signs.   The City seeks summary judgment on the grounds that Roland has not been treated any differently than any similarly-situated entity or individual, and Roland's proposed signs were rejected because they far exceeded the size permitted by the Ordinance. Because the motions overlap and are intertwined, the Court addresses the arguments in the order presented by Roland.  First, however, the Court considers the issue of standing.

### A.  Standing

The only evidence before the Court is that Roland sought to erect off-premises signs that were indisputably far in excess of those allowed by the Ordinance.  This raises the preliminary question of whether Roland even has standing to bring its claims.[2]

---

[2] In its response brief, Roland does not mention standing even though that issue was raised by the City in its opening brief.

Under Article III, this Court is limited to deciding cases or controversies, an element of which is standing. Ariz. State Legislature v. Ariz. Ind. Redistricting Comm'n, 135 S. Ct. 2652, 2663 (2015). The requirements for standing have been set forth by the Supreme Court as follows:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (internal quotation marks, citations, and footnote omitted). "In requiring a particular injury, the Court [in Lujan ] meant that 'the injury must affect the plaintiff in a personal and individual way.'" Ariz. Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 134 (2011) (quoting Lujan, at 560 n. 11, 112 S. Ct. 2130).

The Sixth Circuit has addressed standing in the context of billboard cases on several occasions. For present purposes, the following cases are particularly instructive.

In Midwest Media Properties, L.L.C. v. Symmes Township, 503 F.3d 456, 461 (6th Cir. 2007), Midwest Media, a billboard company, applied nine times for zoning permits to allow it to display billboards in the greater Cincinnati metropolitan area. Each time, the township denied the applications because the proposed signs did not meet the sign limits for off-premises signs under the governing ordinance. After the last denial, the billboard company filed suit "challenging the validity of the off-premises advertising ban, though not the size and height restrictions." Id. at 405. In affirming the district court's conclusion that the billboard company lacked standing, the Sixth Circuit wrote:

The key problem with plaintiffs' claim is one of redressability. Even if plaintiffs could show that the township's original off-premises advertising ban (or its sign-approval process) violated the First Amendment, each of Midwest Media's nine sign applications sought permission to post signs that plainly violated the township's size and height regulations. . . . Yet plaintiffs chose not to challenge the size and height requirements in their complaint—perhaps in view of the difficulty of such a challenge here. See Prime Media, Inc. v. City of Brentwood, 398 F.3d 814, 818–21 (6th Cir.2005) (rejecting challenge to sign ordinance's size and height requirements); see also Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 807, 104 S. Ct. 2118, 80 L. Ed.2d 772 (1984) (rejecting challenge to city's ban on posting signs on public property).

Having chosen not to challenge the size and height regulations and having filed nine applications to post a sign in the township that violated these regulations, plaintiffs cannot tenably show that success in challenging other regulations of the sign ordinance will redress any injury caused by these regulations. For even in the absence of these regulations—even if, consistent with the relief sought in plaintiffs' complaint, our court invalidated them—that would not redress plaintiffs' injury because the size and height restrictions still would preclude the township from approving their sign applications and thus still would preclude plaintiffs from erecting each of these signs.

Id. at 461–62.

Similarly, and relying on Midwest Media, the Sixth Circuit upheld the district court's conclusion in International Outdoor, Inc. v. City of Southgate, 556 F. App'x 416, 417 (6th Cir. 2014), that  a billboard advertising company lacked standing to object to the denial of its applications to erect eight billboards, even though it argued that "the city's blanket ban on billboards and off-premises signs violated its First and Fourteenth Amendment rights by favoring on-site commercial speech over off-site noncommercial speech." Id. This was because, even if the billboard ban were ruled unconstitutional, the billboard company would still be prevented from erecting its proposed signs because they would violate the height and sign limitations imposed on all free-standing signs found in another provision of the ordinance.

Finally, Prime Media, Inc. v. City of Brentwood, 485 F.3d 343, 345 (6th Cir. 2007) ("Prime

Media II") involved a challenge to the sign ordinance in Brentwood, Tennessee. In an initial appeal (discussed in <u>Midwest Media</u>), the Sixth Circuit upheld a challenge to an ordinance that limited the size of billboards to a face area of 120 square feet and a height of 6 feet, but returned the case to the district court to consider, in the first instance, the billboard company's facial challenge to the entire ordinance and its equal protection challenge to the ordinance, including its "standing to raise them." <u>Prime Media, Inc. v. City of Brentwood</u>, 398 F.3d 825 (6th Cir. 2005) ("<u>Prime Media I</u>"). On remand, the district court found the billboard company lacked standing. In affirming that decision, the Sixth Circuit observed:

> There is little dispute that the remaining portions of the ordinance have not caused and do not imminently threaten any injury to Prime Media. If it had attempted to produce a billboard which complied with the height and size requirements, and was threatened with rejection or regulation under the other challenged ordinance provisions, there would arguably be a cognizable injury in fact. Even if it had articulated some plans that it had developed to erect such a sign, but was discouraged from doing so because it was destined to lose based on one of the ordinance's substantive provisions (i.e. other than the so-called permitting provision), Prime Media might have a claim of an imminent, threatened injury. However the record bears no evidence of such a development. As a result, Prime Media has not been subject to or affected by the other ordinance provisions challenged in its remaining claims.

<u>Prime Media II</u>, 485 F.3d at 352.

Much the same can be said about Roland's complaint. Nowhere does he challenge the size restrictions imposed by the City. Instead his complaint is grounded on equal protection, including that the ordinance (1) "discriminates against speakers based upon the content of their speech," (Doc. No. 1-1 Complaint ¶ 12); and (2) creates "a *de facto* enforcement regime in which business located within the city limits . . . are allowed to engage in protected speech while business located elsewhere are not allowed to engage in protected speech." (<u>Id</u>. ¶ 14). Roland also claims that "the law regarding Livingston's illegal policy, custom, practice, rule and ordinance is well settled," and

cites the Supreme Court's decision in <u>Reed v. Town of Gilbert</u>, 135 S.Ct. 2218 (2015) for that proposition. (<u>Id</u>. ¶ 15).

The Court recognizes that <u>Reed</u> was decided after <u>Midwest Media</u>, <u>Int'l Outdoor</u>, and <u>Prime Media</u>, and that <u>Reed</u> has been characterized as "announc[ing] a sea change in the traditional test for content neutrality under the First Amendment." <u>Wollschlaeger v. Governor, Fla.</u>, 848 F.3d 1293, 1332–33 (11th Cir. 2017) (Tjoflat, J., concurring); <u>see also</u>, <u>Free Speech Coal., Inc. v. Attorney Gen. United States</u>, 825 F.3d 149, 174 & n.7 (3d Cir. 2016) (stating that "the Supreme Court complicated matters when it issued its opinion in <u>Reed</u>," and collecting cases for the proposition that "[o]ur sister circuits have also noted that <u>Reed</u> represents a drastic change in First Amendment jurisprudence"). However <u>Reed</u> did not involve standing, and, while Roland claims <u>Reed</u> to be "controlling law," (Doc. No. 29 at 3), the Court finds that it is not for the reasons expressed later in this opinion.

Because Roland does not directly challenge the size restrictions imposed by the City, Roland likely lacks standing to pursue its challenges under prevailing Sixth Circuit law. Assuming that it does, Roland's claims fail as a matter of law.

**B. Commercial v. Non-Commercial Speech**

Substantively, Roland begins with the curious argument[3] that, under the Ordinance, "signage for commercial and industrial business are given special treatment to the exclusion of all other types of signage, and that "this amount to a preference for commercial speech over non-commercial speech." (Doc. No. 22-1 at 4). This is simply incorrect.

---

[3] The Court views this as a curious argument given that Roland is indisputably in the business of erecting billboards for profit, and specifically sought to erect off-premises signs that are defined in the Ordinance as being directed towards promoting other businesses. If commercial speech were truly given preferential treatment by the City, it would inure to Roland's benefit and Roland could not claim harm based upon disparate application of the law.

Properly read, the Ordinance gives a general grant of permission to erect signs, but places restrictions on-off premise signs that promote other businesses. This is hardly unheard-of, and Roland's reliance on Metromedia, Inc. v. City of San Diego, 453 U.S. 490 (1981) for the proposition that "[t]he Ordinance impermissibly favors commercial speech and disfavors non-commercial speech" (Doc. No. 22-1 at 6) is misplaced.

Metromedia, which invalidated a San Diego ordinance that banned virtually all noncommercial billboards, has been characterized as "fractured," Van Wagner Boston, LLC v. Davey, 770 F.3d 33, 41 (1st Cir. 2014), if not "badly splintered," Rappa v. New Castle Cty., 18 F.3d 1043, 1047 (3d Cir. 1994), and of "dubious precedential value," Tanner Advert. Grp., L.L.C. v. Fayette Cty., 451 F.3d 777, 794 (11th Cir. 2006). There were five separate opinions, and "the Supreme Court has ever explicitly adopted or rejected the reasoning of any of the Metromedia opinions." Solantic v. City of Neptune Beach, , 410 F.3d 1250, 1262 n.10 (11th Cir. 2005).

Justice White, writing for the plurality, found the ordinance constitutional insofar as it restricted commercial advertising to on-site advertising. The problem was, however, that "[t]here [was] no similar exception for noncommercial speech." Metromedia, 453 U.S. at 513. That is, "[t]he use of onsite billboards to carry commercial messages related to the commercial use of the premises [was] freely permitted, but the use of otherwise identical billboards to carry non-commercial messages [was] generally prohibited." Id. This was problematic under the First Amendment because, "[i]nsofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages; the city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages." Id. Where, as here, however, an onsite exception

9

applies to both commercial and non-commercial speech, an ordinance does "not favor commercial over non-commercial speech within the same category of speech" and renders Metromedia's plurality opinion inapplicable. Rappa, 18 F.3d at 1056; see also, Ackerley Commc'ns of Mass., Inc. v. City of Cambridge, 88 F.3d 33, 37 n.8 (1st Cir. 1996) (stating that, under Metromedia, "a city lawfully may exempt signs bearing onsite commercial messages without also exempting those bearing offsite commercial messages").

The rationale for drawing a distinction between onsite and offsite advertising of a business is straightforward: "A landowner or commercial enterprise has much more significant interest in identifying or advertising its own business or products than in advertising the products of others. Thus, a governmental entity may restrict the landowner's interest in advertising the products of others in the interests of aesthetics and safety, while leaving the landowner's interest in advertising its own business intact." Messer v. City of Douglasville, 975 F.2d 1505, 1508–09 (11th Cir. 1992). As the Sixth Circuit observed post-Metromedia:

> [T]he on-premises/off-premises distinction does not constitute an impermissible regulation of content just because the determination of whether a sign is permitted at a given location is a function of the sign's message. Kentucky, by allowing persons who own or lease property, to have a sign, subject to size and space restrictions, advertising an activity conducted on the property is not favoring one message over another. The state has simply recognized that the right to advertise an activity conducted on-site is inherent in the ownership or lease of the property.

Wheeler v. Comm'r of Highways, Com., Ky., 822 F.2d 586, 591 (6th Cir. 1987); see also, Ackerley Commc'ns of Mass., Inc. v. City of Somerville, 878 F.2d 513, 517 (1st Cir. 1989) ("In effect, Metromedia set up a hierarchy of values for those signs: an offsite commercial message may be deemed less important than the interest underlying the ordinance (aesthetics or safety) which, in turn, may be deemed less important than an onsite commercial message.")

The Livingston Ordinance draws a distinction between onsite and offsite signs, but does not contain the content-based infirmities addressed in Metromedia. As the City points out, the ordinance does not prohibit signs expressing a viewpoint, and one can erect a sign that says "Trump is Horrible," or "Trump is Great." (Doc. No. 27 at 5). It also allows for commercial signs, such as "Trump's Golf Course," but limits the size of such a sign depending upon whether it is actually sitting on the golf course, or elsewhere. (Id. At 6). The fact that commercial signs can only be placed in certain locations does not amount to a content-based restriction, or the favoring of commercial over noncommercial speech as Roland argues.

A similar, but more restrictive sign ordinance than the one presented here was upheld by the Eleventh Circuit in Coral Springs Street Systems., Inc. v. City of Sunrise, 371 F.3d 1320 (11th Cir. 2004). There, the City of Sunrise, Florida enacted a sign code that prohibited "off-premises commercial signs or billboards," that was later amended to prohibit offsite signs "specifically defined as being '[a]ny sign advertising a commercial establishment, activity, product, service or entertainment, which is sold, produced, manufactured, available or furnished at a place other than on the property on which the sign is located.'" Id. at 1343 (internal citation omitted). There, like here, a billboard company "suggest[ed] that these provisions somehow discriminate[d] against noncommercial speech, even though the restrictions appl[ied] only to commercial speech." Id. Relying heavily on Metromedia, the Eleventh Circuit rejected the argument, writing:

> In Metromedia . . . , the Supreme Court struck down certain aspects of a city's billboard ordinance favoring commercial over noncommercial speech and certain kinds of noncommercial speech over others, but also permitted cities to distinguish reasonably between onsite and offsite commercial advertising:
>
> > [W]hether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics. This is not altered by the fact that the ordinance

11

is underinclusive because it permits onsite advertising. Second, the city may believe that offsite advertising, with its periodically changing content, presents a more acute problem than does onsite advertising. Third, San Diego has obviously chosen to value one kind of commercial speech—onsite advertising—more than another kind of commercial speech—offsite advertising.

. . . These words are exactly on point in this case, where the City's suspect provision distinguishes between on-site commercial and off-site commercial advertising, but makes no reference to noncommercial speech.

Coral Springs St. Sys., 371 F.3d at 1343–44 (internal citation omitted).

Commercial signs can be restricted in size because "[s]ign height and size restrictions promote substantial municipal interests in aesthetics and traffic safety." Prime Media, Inc. v. City of Franklin, 181 F. App'x 536, 539 (6th Cir. 2006) ("Prime Media/Franklin"). For example, and as already noted, in the City of Brentwood case signs were restricted to 120 square feet (60 square feet per side), while in the amended ordinance in the City of Franklin case limited free standing signs to no more than 6 feet in height and 32 square feet per side. Here, of course, the size of off-premises signs is more restricted (although the 250' feet sign Roland intended would not be permitted in Brentwood or Franklin), but there is nothing in the record to suggest that the City somehow favors commercial over noncommercial speech. Nor is the City required to undertake a "stringent duty of calibration," so long as the "dimensional restrictions have ameliorated the problems the government sought to address[.]" Prime Media I, 398 F.3d at 823. To ask the City to justify a size restriction . . . would impose great costs on local governments and at any rate would do little to improve [a court's] ability to review the law-because any further explanation assuredly would contain the kind of aesthetic and subjective judgment that judges are not well-equipped to second guess. " Id. at 823-34.

## C. Content-Based Restriction

Roland next argues that, because the Ordinance allows for certain off-premise signs if the sign represents a business or entity within the City but does not allow such a sign if it advertises a business elsewhere (such as Cookeville), the Ordinance is unlawful because it imposes a content-based restriction. However, as the City points out in its own Motion for Summary Judgment, "[t]he Ordinance [§ 11-203.9(n)] was amended to remove the restriction that an off-premise sign relate only to a business or entity within the corporate limits." (Doc. No. 25 at 16). That change took effect on December 4, 2017. See Bench Billboard Co. v. City of Cincinnati, 675 F.3d 974, 981 (6th Cir. 2012) (citation omitted) ("Legislative repeal or amendment of a challenged statute while a case is pending on appeal usually eliminates this requisite case-or-controversy because a statute must be analyzed by the . . . court in its present form."). And, there is nothing before the Court to suggest that the City will revert to the old Ordinance. See, id. (stating that where there was "no threat to re-enact the ordinance, claims based upon the prior ordinance were moot).

Roland insists that, notwithstanding the change, "§ 11-203.9.1 contains a veritable hodgepodge of allowances and restrictions on various types of signs," and "includes content-based distinctions and disparate treatment for numerous types of signs, both commercial and non-commercial." (Doc. No. 29 at 5). Roland goes on to argue:

> Some of these include temporary signs pertaining to campaigns, § 11-203.9.1(c); directional signs for real estate, § 11-203.9.1(o); auction signs, § 11-203.9.1(p); and yard/garage sale signs, §e 11-203.9.1(q). In contrast, some signs such as those related to "political, civic, philanthropic, educational, or religious organizations" appear to face no restrictions at all and have the favor of city officials. §11-203-9.1(b).

(Id.). As such, Roland maintains that "[t]he case at bar should be governed by Reed." (Id. at 6).

Roland sought to erect off-premises commercial signs and he is not in a position to argue

about allegedly discriminatory treatment regarding auction signs, real estate signs, political signs, or anything else.  As the Sixth Circuit stated in Prime Media II,  "standing with regard to the size and height requirements does not magically carry over to allow it to litigate other independent provisions of the ordinance without a separate showing of an actual injury under those provisions."  485 F.3d at 350.

Nor does Reed support Roland's position.  That case involved the Town of Gilbert, Arizona's sign code that prohibited the display of outdoor signs anywhere without a permit, but exempted 23 categories of signs.  Three of those categories were at issue, and the treatment given each was different.

"Ideological signs," treated most favorably, were allowed to be up to 20 square feet and placed in all districts without time restrictions.  "Political signs," treated less favorably, were allowed to be up to 16 square feet on residential property and up to 32 square feet on nonresidential property, but were governed by time limitations in relation to primary and general elections.  Treated the least favorably were "temporary directional signs," that were subject to strict geographical limits, not allowed to be larger than 6 square feet, and could be posted no more than 12 hours before, or 1 hour after, an event.

In Reed, the Supreme Court began by reiterating what it said in Police Department of Chicago v. Mosley, 408 U.S. 92, 95 (1972): under the First Amendment (applicable to the states via the Fourteenth Amendment) a municipal government vested with state authority "has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  The Court found that Gilbert's sign code was "content based on its face," because whether the restrictions applied to any given sign depended "entirely on the communicative content of the sign."  Reed, 135

S. Ct. at 2227. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." Id. (quoting Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 429 (1993)). Strict scrutiny "'requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest,'" Arizona Free Enterprise Club's Freedom Club PAC v. Bennett, 131 S.Ct. 2806, 2817 (2011), and the Town of Gilbert made no such showing.

The Supreme Court in Reed may have "amplified its commitment against content-based laws" as Roland argues (Doc. No. 22-1 at 7), but it did not endeavor to enact a wholesale change in the general regulation of billboards. As Justice Alito pointed out in his concurring opinion, "[p]roperly understood, today's decision will not prevent cities from regulating signs in a way that fully protects public safety and serves legitimate esthetic objectives," nor does it mean that "municipalities are powerless to enact and enforce reasonable sign regulations." Reed, 135 S. Ct. at 2233–34. While he did "not attempt to provide anything like a comprehensive list," Justice Alito listed a "number of rules that would not be content based," including:

Rules regulating the size of signs. These rules may distinguish among signs based on any content-neutral criteria, including any relevant criteria listed below.

Rules regulating the locations in which signs may be placed. These rules may distinguish between free-standing signs and those attached to buildings.

*       *       *

Rules distinguishing between signs with fixed messages and electronic signs with messages that change.

*       *       *

Rules distinguishing between on-premises and off-premises signs.

Id. at 2233.

It is true, as Roland argues, that Justice Alito's concurring opinion is not controlling law. However, post-Reed, "requiring business signs to direct attention to the 'primary business . . . conducted on the premises'" was deemed to be a valid content-based restriction by the Ninth Circuit in Contest Promotions, LLC v. San Francisco, 704 F. App'x 665, 667 (9th Cir. 2017). Furthermore, "Reed did not relate to commercial speech, or mandatory disclosures as a part of commercial speech, and therefore did not have occasion to consider those doctrines." Nationwide Biweekly Admin., Inc. v. Owen, 873 F.3d 716, 732 (9th Cir. 2017). To view it as doing so, and "to find a new First Amendment principle between the lines of Reed, is like trying "to find a black cat in a dark room, especially if there is no cat." Id. In short, while "[f]ew courts have had occasion to address it post-Reed, . . . the majority of courts that have considered the question have held that the holding in Reed is limited to noncommercial sign regulations and does not alter or otherwise affect precedent relating to municipal regulations of commercial signs." Geft Outdoor LLC v. Consl. Cty. of Indianapolis and Marion Cnty., 187 F. Supp. 3d 1002 (S.D. Ind. 2016) (citations omitted).[4]

"The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward v. Rock Against Racism, 491

---

[4] In a Supplemental Affidavit filed in response to the City's Motion for Summary Judgment, Roland claims that its signs would not be limited to commercial advertisements. Instead, they would also include "political advertisements, news announcements, community bulletin board messages , and the dissemination of emergency information," along with "the dissemination of political messages representative of political ideas personnally held" by David Roland." (Doc. No. 31, Roland Supp. Aff. ¶ 7). There is no indication of the percentage of space or time that would be devoted to non-commercial messages, however, and there is no dispute that Roland is in the business of making money off of its billboards through commercial advertising. In any event, this action is based upon Roland's attempt to erect "off-premises signs" that, by definition, advertise businesses or services at a location other than where the sign is placed.

U.S. 781, 791 (1989). There is nothing in the record to suggest nefarious reasons for the City's

denial of Roland's request to erect what it admitted to be a billboard that would serve as a "gigantic

TV screen." To the contrary, his request was denied because the Ordinance was intended to serve

the dual purpose of preserving the aesthetic appearance of the city, and to reduce driver distraction.[5]

## D. Total Ban

Roland also argues that "the net effect of the Ordinance is a complete and total ban on

signage speech" and, as applied to it, "amounts to a total ban on signage speech at all." (Doc. No.

22-1 at 10). Given the realities and Sixth Circuit precedent, this argument requires little discussion.

As a preliminary matter, there is no ban on signage. While Roland wants to display

commercial ads on what are effectively jumbo-sized television screens, alternatives exist and he

cannot legitimately claim that he is allowed to place those signs anywhere he desires. As the Sixth

Circuit has explained,

> an alternative is not inadequate simply because the speaker must change its tactics.
> If this were so, then a speaker could limit the adequacy of alternatives by choosing
> its method of communication and limiting its tactics to a specific form of
> communication. Such a rule would largely deprive the government of the ability to
> enact reasonable time, place, and manner restrictions.

Contributor v. City of Brentwood, 726 F.3d 861, 866 (6th Cir. 2013).

Moreover, while Roland wants to place the signs on specified lots for which his has

---

[5] To support its position that these are the aims of the Ordinance, the City relies upon the affidavit
of Darius Simms, its Codes Inspector. In response, Roland argues that Simms is not in a position to
effectively state the City Council's intent in enacting the Ordinance. However, as the Supreme Court
recognized in Metromedia, "the accumulated, common-sense judgments of local lawmakers and of the many
reviewing courts [is] that billboards are real and substantial hazards to traffic safety," and "[i]t is not
speculative to recognize that billboards by their very nature, wherever located and however constructed, can
be perceived as an "esthetic harm.'" Metromedia, 453 U.S. at 509-10; see also, Contest Promotions, 704 F.
App'x at 668 (stating that "it is well established that Defendant's interests in safety and aesthetics are
substantial").

contracted with homeowners, "alternative channels of communication need not be available at every location, or at the most desirable location, within a city." Prime Media/Franklin, 181 F. App'x at 541. Thus, for example, the City of Franklin could limit the size of signs, even though the billboard operator's targeted audience was those who drove the I-65 corridor. This was so because those drivers could "obviously be reached through a variety of means when they are not on the interstate." Id. That is, "local residents and travelers who stop in the city can be reached through newspapers, radio, television, [or] smaller signs off the I–65 corridor," while "[t]ravelers who do not stop in the city can be reached through radio, regional or national newspapers and television, and billboards located outside the city." Indeed, because of "the many alternative means of expression left open by the city's height and size restrictions" it did not matter "whether conforming signs c[ould] be read from I–65 at normal highway speeds." Id. at 541.

Likewise here, signs are permitted in Livingston, albeit of a size smaller than Roland wants for commercial off-premises signs. There are other means to advertise to City residents, and it is incumbent on Roland to make some showing that these alternatives are inadequate. Contributor, 726 F.3d at 866-67. Roland has made no such showing.

**E.  Motion to Supplement**

After the briefing had been completed on the Cross-Motions for Summary Judgment, Roland filed a Motion for Leave of the Court to File a Supplement to Plaintiff's Motion for Summary Judgment. (Doc. No. 32). In it, Roland brought to the Court's attention that (1) a digital billboard had recently been erected within the corporate limits of the City of Livingston; (2) City Mayor Curtis Hayes attended a ribbon-cutting ceremony for the new billboard; (3) City Alderman Chris Speck advertised on the new billboard in relation to his family business; and (4) the Chamber of

Commerce lauded the construction of the billboard by issuing the following press release:

> Placed along Highway 111, the most traveled road through the city, the digital display produces the maximum number of impressions to its audience. Because the screen is electronic, advertisers have the ability to change their advertising message daily, weekly, hourly, or even in real time. More custom options will allow specific, user generated content as well as endless possibilities. Using a dynamic ISPOT, where live data and content from website or social media allows message or image display in real time. For more information regarding the use of digital advertising, contact Lamar Cookeville.

(Doc. No. 32-1 at 1-2). Viewing these developments as a complete about-face, Roland argues that the City should be judicially estopped from relying on many of the arguments it has made, including that (1) Roland's proposed sign is "colossal"; (2) "colossal signs are not permitted by the Livingston City Code because they are entirely too large"; (3) "[t]he City of Livingston has made a reasoned judgment that large billboards are not appropriate for the community, because of the aesthetic damage to the appearance of the community along with the distractions to drivers from such large signs"; (4) "[f]ree-standing signs of this massive size are not allowed, whether on-premise or offpremise, commercial or non-commercial"; (5) "[i]t is hard to imagine anything more distracting to a driver than 'a giant TV'"; (6) "Plaintiff's sign application was denied because his proposed colossal 250 square foot sign did not meet the size restrictions"; (7) "Plaintiff was not permitted to construct the enormous sign"; and (8) "Plaintiff could never have built the enormous offending sign for the independent reason that Plaintiff sought a sign too large." (Id. at 2-3) (internal citations omitted).

Based upon Roland's representations, this Court entered an Order (Doc. No. 33) requiring the City to respond, and allowing Roland the opportunity to file a reply. After the City filed its response, Roland chose not to reply, perhaps because this entire issue is a red herring.

As Roland correctly notes, judicial estoppel "preserves the integrity of the courts by

preventing a party from abusing the judicial process through cynical gamesmanship," <u>Browning v. Levy</u>, 283 F.3d 761, 776 (6th Cir. 2003), and by preventing a party from "playing fast and loose with the courts," "blowing hot and cold as the occasion demands," or "having [one's] cake and eating it too." <u>Reynolds v. Comm'rs.</u>, 861 F.2d 469, 472 (6th Cir. 1988). The Supreme Court has explained that invocation of the doctrine is a matter of discretion and "several factors typically inform the decision whether to apply the doctrine in a particular case." <u>New Hampshire v. Maine</u>, 532 U.S. 742, 750 (2001). Those factors are:

> First, a party's later position must be "clearly inconsistent" with its earlier position. . . . Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled[.]" . . . Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' . . . and thus poses little threat to judicial integrity. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

<u>Id.</u> at 750-51.

The factors favoring judicial estoppel are not present here. Not only had the Court not ruled when the matter was brought to its attention and hence the City obtained no unfair advantage, the City has not been shown to have undertaken a "clearly inconsistent" position in relation to the new billboard that has been erected.

As the City has explained (without dispute), the new billboard is on land that was previously a part of Overland County, which permitted the erection of billboards. That land has since been annexed by the City and, at the time of annexation, had a billboard on it. Given state law, the City did not have the authority to deny a request to fix and update the billboard and require a conforming

use.[6]

Local governmental units "obtain their power to enact zoning ordinances and otherwise regulate the use of land by delegation from the state." Smith Cty. Reg'l Planning Comm'n v. Hiwassee Vill. Mobile Home Park, LLC, 304 S.W.3d 302, 310 (Tenn. 2010) (citing Edwards v. Allen, 216 S.W.3d 278, 284 (Tenn. 2007)). That power is not absolute, however, and is subject to Tennessee's grandfather clause that serves as "an exception to a restriction that allows all those already doing something to continue doing it, even if they would be stopped by the new restriction." Lamar Tennessee, LLC v. City of Hendersonville, 171 S.W.3d 831, 835–36 (Tenn. Ct. App. 2005) (citation omitted). In pertinent part, the grandfather clause reads:

> (b)(1) In the event that a zoning change occurs in any land area where such land area was not previously covered by any zoning restrictions of any governmental agency of this state or its political subdivisions, or where such land area is covered by zoning restrictions of a governmental agency of this state or its political subdivisions, and such zoning restrictions differ from zoning restrictions imposed after the zoning change, then any industrial, commercial or business establishment in operation, permitted to operate under zoning regulations or exceptions thereto prior to the zoning change shall be allowed to continue in operation and be permitted; provided, that no change in the use of the land is undertaken by such industry or business.
>
> (2) When the use permitted to continue to expand, or to be rebuilt pursuant to any subsection of this section is an off-premises sign, such use shall not preclude any new or additional conforming use or structure on the property on which the sign structure is located or on any adjacent property under the same ownership; provided, however, that any such new or additional use or structure does not result in any violations of the applicable zoning restrictions other than those nonconformities associated with the off-premises sign as allowed under this subdivision (b)(2).
>
> (c) Industrial, commercial or other business establishments in operation and permitted to operate under zoning regulations or exceptions thereto in effect immediately preceding a change in zoning shall be allowed to expand operations and construct additional facilities which involve an actual continuance and expansion of

---

[6] Though not mentioned by Roland, the City claims (and Roland does not deny) that Roland itself on several occasions has sought to erect nonconforming billboards on property subsequently annexed by the City of Cookeville.

the activities of the industry or business which were permitted and being conducted prior to the change in zoning; provided, that there is a reasonable amount of space for such expansion on the property owned by such industry or business situated within the area which is affected by the change in zoning, so as to avoid nuisances to adjoining landowners. No building permit or like permission for construction or landscaping shall be denied to an industry or business seeking to expand and continue activities conducted by that industry or business which were permitted prior to the change in zoning; provided, that there is a reasonable amount of space for such expansion on the property owned by such industry or business situated within the area which is affected by the change in zoning, so as to avoid nuisances to adjoining landowners.

Tenn. Code Ann. § 13-7-208 (b) & (c).

Tennessee's grandfather clause applies to billboards, and billboards can be an a "business" and "establishment" within the meaning of the statute. Outdoor W. of Tennessee, Inc. v. Cty of Johnson Cty, 39 S.W.3d 131, 137 (Tenn. Ct. App. 2000). The grandfather clause "clearly permits a business to demolish, rebuild, and expand so long as the requirements of th[e] statute are satisfied." Id. This arguably includes converting an existing static billboard into a digital one. See, Lamar Tennessee, LLC v. Murfreesboro Bd. of Zoning Appeals, 336 S.W.3d 226, 234 (Tenn. Ct. App. 2010) (declining to resolve the matter but stating that "[h]ad Lamar disclosed to the City its intent to place a digital display on the reconstructed billboard, and had the City then denied a permit on that basis, Lamar could argue to a reviewing court that the City is required to issue it a permit for a billboard with a digital display").[7]

There is nothing before the Court to suggest that the Livingston-Overton County Chamber of Commerce is different than any other such chamber whose goal is to promote the local business community, and certainly nothing that would suggest the Chamber of Commerce speaks for the City

---

[7] Obviously, whether the City should have mandated that any upgrades be static as opposed to digital is not a matter for this Court to decide.

of Livingston on matters of zoning. That the Mayor may have attended a ceremonial ribbon cutting ceremony as a courtesy, and that a recently-elected Alderman's funeral home advertises on the new billboard does not suggest that the City Council has somehow changed course in relation to its view about large billboards in the City. Just as a court speaks through its Orders, a city speaks through its enactments. See, Carter Cty. Bd. of Ed. Comm'rs v. Am. Fed'n of Teachers, 609 S.W.2d 512 (Tenn. Ct. App. 1980); Stegall v. City of Chattanooga, 66 S.W.2d 266, 270 (Tenn. Ct. App. 1932). The City of Livingston has spoken through its enaction of § 11-203.9(n) limiting the size of off premises signs.

## IV.  Conclusion

On the basis of the foregoing, Roland's Motion for Leave of the Court to File a Supplement to Plaintiff's Motion for Summary Judgment" (Doc. No. 32) will be granted, but its Motion for Summary Judgment (Doc. No. 22) will be denied. The City's cross-Motion for Summary Judgment (Doc. No. 23) will be granted.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE